**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

JOYCE ROCK,

        Plaintiff,

v.                                     No. CIV-13-0652 KBM/CG

DON LEVINSKI, individually
and in his official capacity;
and BOARD OF EDUCATION OF
CENTRAL CONSOLIDATED SCHOOL DISTRICT,

        Defendants.

## RESPONSE TO MOTION FOR SUMMARY JUDGMENT

"Teachers (and a fortiori, principals) are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operations of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal. "[1]

" . . . (P)ublic employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." [2]

"The public interest in having free and unhindered debate on matters of public importance—the core value of the Free Speech Clause of the First Amendment—is so great that it has been held that a State cannot authorize the recovery of damages by a public official for defamatory statements directed at him except when such

---

[1] Pickering v. Board of Education of Township High School District 205, Will County, Illinois, 391 U.S. 563, 572 (1968)(parenthetical supplied).

statements are shown to have been made either with knowledge of their falsity or with reckless disregard for their truth or falsity."[3] "In sum, we hold that, in a case such as this, absent proof of false statements knowingly or recklessly made by him,[6] a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment."[4]

"The question under Garcetti[5] is not whether the speech was made during the employee's work hours, or whether it concerned the subject matter of his employment. Merely because an employee's speech was made *at* work and *about* work does not necessarily remove that employee's speech from the ambit of constitutional protection. *See Brammer-Hoelter,* 492 F.3d at 1204. **Rather, it is whether the speech was made pursuant to the employee's job duties or, in other words, whether the speech was "commissioned" by the employer**. *Garcetti,* 547 U.S. at 421-22, <u>126 S.Ct. 1951</u>."(emphasis supplied). [6]

This law makes clear that defendants' argument and interpretation of the controlling authority is fatally flawed. The defendants do not show themselves entitled to judgment under Rule 56. The motion impermissibly construes the facts in a manner most favorable to the movants, when the law requires that the evidence be viewed in a light most favorable to Joyce Rock. It blatantly ignores, without discussion, evidence in the record completely contrary to its so-called "factual" allegations. Joyce Rock's response here shows the motion must be denied.

---

[2] Garcetti v. Ceballos, 547 U.S. 410, 417 (2006)
[3] Pickering at 573-74.

[4] Id at 574

[5] Garcetti v. Ceballos, 547 U.S. 410 (2006).
[6] Thomas v. City of Blanchard, 548 F.3d 1317, 1323 (10th Cir. 2008).

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

**D.N.M. LR-56.1(b) Additional Facts Material to Resolution of the Motion**

Joyce Rock provides the Court with these additional facts omitted from defendants' motion which are material to show the Court the legal and factual insufficiency of defendants' motion:

A. Joyce was terminated because of her speech at the community meeting. Levinski testified that "the Wednesday night meeting (was) the primary reason why Joyce was fired", because she "publicly took the position that Career Prep should not be closed".[7]

C. The May 8th community meeting was called to discuss the proposed closing of Career Prep, Joyce was not asked by anyone to come to the meeting. She was not required to be there. She was not told by anyone to come to the community meeting to defend the District or Mr. Levinski.[8]

D. Joyce was asked by Mr. Levinski to attend the staff meeting held earlier that day where she did speak to him as principal of Career Prep. At the close of that meeting she had complied with Mr. Levinski's request to be present as principal to facilitate his presentation to the staff and had no more to say on the matter as principal to him or other members of the District.[9]

E. The community meeting was attended by the Farmington media, parents of students from Career Prep and other District schools, ex-students, and other members of the Shiprock community that were neither students at Career Prep or parents of students at Career Prep.[10]

---

[7] Defendants' Exhibit F, Deposition of Don Levinski (hereafter Levinski) pp. 9:20-12; 10:1-4.
[8] Plaintiff Exhibit 2; Plaintiff Exhibit 1, Rock Affidavit paragraph 1; Levinski 44:14-16; Defendants' Exhibit D, Deposition of Phil Kasper (hereafter Kasper) 64;20-22.
[9] Rock Affidavit paragraph 1.
[10] Rock affidavit paragraph 2;

3

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

F. At the community meeting Joyce did not open the meeting as principal or otherwise. The meeting was opened by Mr. Levinski and Mr. Kasper who presented a PowerPoint on the reasons Mr. Levinski felt that Career Prep needed to be closed.[11]

G. At the meeting Joyce listened to the presentation like everyone else present, sitting in the second row of chairs, as is shown in the picture marked as Exhibit 2, not up front as the other members of the District's administration did.[12]

H. Joyce was not the first member of the community to speak at the meeting. When she spoke at the meeting, she did not do so as a principal but as another member of the community invited to the meeting. She addressed the other members of the community assembled there as is shown in the picture marked as Exhibit 3, not Mr. Levinski or Mr. Kasper.[13]

I. When I spoke I did so to encourage the others there to voice their opinions about closing Career Prep, and added my opinions that the students that had been finally succeeding pursuant to the mission of Career Prep as an alternative school may not choose to attend another school, or may not be able to succeed in the same way at another school, in part because many of them had already been to those schools, and had trouble that caused them to go to Career Prep in the first place.[14]

J. When Joyce spoke to the other members of the community present, she did so respectfully and calmly, not in any manner that would cause a reasonable person to feel she was inciting some sort of heightened emotions among the public gathered

---

[11] Rock affidavit paragraph 3.
[12] Rock Affidavit paragraph 4.
[13] Exhibit 3;Rock Affidavit paragraph 5.
[14] Rock affidavit paragraph 6; Plaintiff's Exhibit 4, Cathy Cullicott affidavit; Defendants' Exhibit A, Rock deposition (hereafter Rock) 75:18-23; 89:11-24; 95:12-16.

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

there.[15]

K. Joyce was not required as principal of Career Prep to attend every meeting held for any purpose at the school. A variety of other meetings took place on school property during the year, for other members of the community, that she was not required to attend and did not attend.[16]

L. It was not any part of any of Joyce's job duties, upon which she was evaluated each year, or otherwise, to give advice or input to the District about issues such as whether to close a school or not. Joyce did not give the District advice or input on such large scale budget-related issues. She had no supervisory duties on any such issues.[17]

M. Joyce knew of the District's mission to give all students the best educational opportunities that available resources allow. Joyce felt it was completely in keeping with that mission to speak against the plan to close Career Prep because that would be contrary to giving the students there the best education that the District's resources would permit, since so many of the Career Prep students were there in the first place because of problems at the schools it was being suggested that they be returned to.[18]

N. Not one member of the Career Prep staff or other member of the community has told Joyce that they felt she was unprofessional or impolite in any way in what she said at the community meeting or how she said it.[19]

O. Joyce did not spend any time, much less three days, "preparing" the students

---

[15] Rock Affidavit; paragraph 7; Cullicott affidavit.
[16] Rock affidavit paragraph 8; Cullicott affidavit (surprised she was there); evidence offered in dispute of defendants' "fact" no. 21 below.
[17] Rock affidavit paragraph 9.
[18] Rock affidavit paragraph 10
[19] Rock affidavit paragraph 11.

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

to protest the closing of their school at the community meeting.[20]

P. No student or anyone else made any threatening gestures or verbal threat toward Mr. Levinski at the community meeting. Some were very emotional but not inappropriately so other than one that raised his voice inappropriately.[21]

Q. At least one staff member from Career Prep that were at the meeting were actually surprised to see Joyce at the community meeting because she had already expressed to Mr. Levinski her questions about the wisdom and propriety of closing the school at the earlier staff meeting.[22]

R. Each of the students or other attendees who spoke were respectful[23] and told their personal story of what Career Prep meant to them; how students got diplomas that wouldn't have otherwise; how they had found a "home"; and how they had previously been in so much trouble but had found a second chance at Career Prep and were turning their life around.[24]

S. Joyce's words to the public assembled at the meeting were perceived by at least one staff member Cathy Cullicott as showing her support for those who were in attendance to voice their opinions on closing the school and her own personal opinion on the propriety and wisdom of closing the school. Joyce told the people assembled that she felt the students who were succeeding at Career Prep were doing so because of the environment there, whereas they had had problems before in other schools.[25]

T. According to Ms. Cullicott and Phil Kasper, Joyce did not speak disrespectfully to anyone. She spoke in her usual calm, gracious, matter-of-fact manner, in both her

---

[20] Rock affidavit paragraph 12; Rock deposition 69:16-23.
[21] Rock affidavit paragraph 13; Rock deposition 90:11-20; Kasper 16:16-22.
[22] Cullicott affidavit.
[23] Rock 90:7-10.
[24] Rock 75:18-23; 89:11-24; 95: 12-16.

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

tone and in what she said.[26]

U. Phil Kasper did not agree that Joyce should be terminated and instead placed her on a "growth plan"[27].

V. Up through the date she was told that she was being terminated, Joyce was in compliance with the growth plan, so there was no disruption to the business of the District.[28]

W. As superintendent, Levinski is supervisor for Pandora  Mike, who in turn is Phil Kasper's supervisor. Kasper was Joyce's supervisor.[29]

X. In that hierarchy, Levinski has no day-to-day contact with Joyce as principal, any communication Joyce has about administrative matters goes to Kasper, he has other employees deal with issues such as termination.[30] Kasper had never seen Joyce even speak in Levinski's office,[31] which is right next to his.[32]

Y. Joyce's speech at the community meeting did not cause any disruption in her working relationship with Kasper or disruption to the business of the District.[33] To the extent there was any negative effect for the district, it would have been temporary.[34]

Z. Joyce's speech at the community meeting did not cause her immediate supervisor Kasper to tell Levinski that night that she had been out of line or inappropriate in any way.[35]

---

[25] Rock affidavit paragraph 6 and 10.
[26] Rock affidavit, paragraph 7; Cullicott affidavit; Plaintiff's Exhibit 5, Deposition of Phil Kasper (hereafter Kasper II) 52-21-53:10.
[27] Exhibit G, Growth Plan; Kasper 9:2-11:7
[28] Kasper II 17:17-18:8.
[29] Kasper II 77:2-3; Defendants' Exhibit G, Growth Plan (signed by Kasper as principal/supervisor).
[30] Levinski 72:22-73:2; 73:18-25.
[31] Kasper II 79:3-4;
[32] Kasper II 22:11-16.
[33] Kasper 53:11-55:12
[34] Id at 55:11-12.
[35] Kasper 14:10-24.

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

**Statement of disputed "facts" asserted by defendants' motion**

The following "facts" asserted by defendant's motion, as numbered therein, are disputed by the summary judgment record and present a material issue of fact precluding summary judgment.

5.      Defendants' generic assertion about Joyce's thoughts and observations about CPHS shared with the Superintendent's office is immaterial to the Court's task here, because the cited testimony does not establish this "fact"; the question asked was not actually ever answered. Furthermore, any such speech by Joyce on the generic topic of CPHS is unconnected to the speech at issue here that occurred at the community meeting, concerning the specific issue of the District's plan to close the school, a matter for which Joyce was not responsible and upon which she was not evaluated in her official duties as principal.[36]

6.      Joyce's job duty to "evaluate data and services . . . " and to "evaluate . . . effectiveness of programs" was as to Career Prep, not district-wide and certainly not as to a superintendent's decision on closing a school. Joyce may have reported information as to these issues as they pertained to the work actually being done or planned for students at Career Prep, but not as to the advisability of **terminating** such services being offered at Career Prep.[37]  Defendant Levinski's and Phil Kasper's testimony makes clear that the proposal and ultimate decision to close the school were or would be made well above Joyce's position in the administration and there is no evidence offered that she had input into that decision, nor could there be any truthfully

---

[36] Rock affidavit paragraphs 5 and 9; Exhibit 6, 5-9-13 Evaluation.

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

offered. [38]

7.      Again, generic discussion of her school's budget or the performance of the school does not equate with the superintendent's decision to propose closing her school. The cited testimony talks about discussion of the generic topics with other principals, and Mr. Kasper, but not with Levinski. Levinski's testimony is that this was not a fait accompli, that it was a proposal by him that still had to be discussed with the community, the Navajo nation and the New Mexico Public Education Department.[39]

8.      Joyce's job was to carry out and communicate District policy, not to make it or even comment on its propriety to the public. As noted in response to alleged fact no. 7, this was not District policy being discussed at the community meeting, it was a proposal by Levinski to be discussed by many others before it was made effective and the school closed.[40]

11.      Joyce's "community relations" duties are immaterial to the allegation made in alleged fact no. 9 because those duties were connected to making members of the community welcome at the school and at Career Prep events, not a public meeting held to discuss whether to close the school. Joyce did not attend every event held at the school, nor did she attend each event that she was present for as principal of the school.[41] This meeting was called by Levinski for the community, not as a Career Prep function.[42]   Joyce's generic duties in this context, to make the community feel welcome when attending events for which she was responsible as principal, are

---

[37] Id.
[38] Levinski 35:23-36:6.
[39] Id.
[40] Id; and Rock affidavit paragraphs 5 and 9; Exhibit 6, 5-9-13 Evaluation.
[41] Rock 84:13-85:2.
[42] Levinski 63:24-25; Plaintiff's Exhibit 7, Deposition of Don Levinski (hereafter Levinski II)  28:18-20; Levinski 35:23-36:1.

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

unrelated to her speech at the meeting in question.

18.    The meeting described here was not only for the students and parents.

Defendants' misrepresentation here of the scope of those invited is an ill-disguised

attempt to make Joyce's speech one not addressed to the public at large, and the

Court should note this misrepresentation in assessing the motion's lack of credibility as a

whole. Defendant Levinski's testimony ignored by defendants' motion on this question

was that "the purpose of the meeting (was) to listen to the community and to listen to

the students and the parents"[43] "the evening meeting was to hear from the **community**

and from the parents and the students, **not from her** or the faculty."[44] (emphasis

supplied).  Levinski further testified, describing where he was in the process of coming to

a final action on closing the school or not, that "we were only at the talking stages.

Understand that we were still only in step two.  We talked to the faculty and we were

talking to the community."[45] The meeting was not intended to be solely for students and

parents, it was "open to the public".[46] These facts show that Joyce's speech took place

in  the context of the quintessential public square, the meeting was for the public to

speak, and not for employees of the District.

20.    The allegation here is belied by the testimony cited to dispute defendants' "fact"

no. 18 above, and defendants' re-assertion of this falsehood here should further

persuade the Court about the baselessness of defendants' motion. In addition, the

cited testimony does NOT say that no member of the public was present, and that

allegation is false. At a minimum, one member of the Farmington media was present[47]

---

[43] Levinski 63:24-25.
[44] Levinski II 28:18-20.
[45] Levinski 35:23-36:1.
[46] Levinski 15:1-6.
[47] Rock affidavit paragraph 2.

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

and ex-students are by definition members of the public.

21.     Joyce Rock objects to the mixed fact and legal conclusion asserted as "fact no. 21 and moves the Court to strike the allegation. As noted in defendants' motion conclusory and self-serving sworn testimony is insufficient to create a factual dispute in the context of a motion for summary judgment.[48]

In the cited testimony Levinski claims that Joyce's *attendance*, but not participation was "expected".  Levinski did not tell Joyce she was required to attend.[49] It was not Joyce's meeting. Kasper did not tell Joyce she had to attend.[50] It was a meeting for "the purpose of … listen(ing) to the community and to listen to the students and the parents".[51]  "(T)he evening meeting was to hear from the **community** and from the parents and the students, **not from her** or the faculty."[52] (emphasis supplied). Levinski further testified, describing where he was in the process of coming to a final action on closing the school or not, that "we were only at the talking stages. Understand that we were still only in step two.  We talked to the faculty and we were talking to the community."[53] The meeting was not intended to be solely for students and parents, it was "open to the public".[54] Levinski's testimony makes clear that he had called the staff meeting to hear from the District's employees, and the community meeting to hear from the public, **not** Joyce.

The meeting unfolded as set forth in Defendants' Exhibit A. Mr. Kasper called the

---

[48] *See Valley Forge Ins. Co. v. Health Care Mgmt. Ptnrs, LTD.*, 616 F.3d 1086, 1095 (10th Cir. 2010).
[49] Levinski 44:14-16.
[50] Kasper 64:20-22.
[51] Levinski 63:24-25.
[52] Levinski II 28:18-20.
[53] Levinski 35:23-36:1.
[54] Id. at 15:1-6.

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

meeting to order, and spoke because Mr. Levinski was ill.[55] Kasper presented a version of the PowerPoint presentation that had been shown to the staff meeting. Kasper and Levinski asked that they be permitted to make that presentation first and save questions or comments for later.[56] After the PowerPoint, members of the community began speaking and voicing their opinions about closing Career Prep.[57] Joyce spoke to the people assembled there near the end of the public comment portion of the meeting.[58]

Levinski and Kasper saying it is so doesn't make it so in the face of not only Joyce's' denial but in view of Levinski's and Kasper's own testimony admitting they did not tell Joyce she had to be there and Levinski's further testimony showing the separation of the two meetings and his intend to have only public input at the community meeting.

22.    Joyce very much disputes that she was expected to attend the community meeting on the basis of the testimony offered in dispute of "fact" no. 21. The testimony cited by defendants' motion in support of the false allegation that she "does not dispute" that she was expected to be there in an official capacity admits no such thing. Joyce's testimony, when asked if Levinski expected her to be there as principal, was that she had "no idea",[59] and that she had no discussion with either Levinski or Kasper about her attendance being required.[60] Defendants' attempt to misrepresent the record here is all the more egregious in view of the testimony cited above from Kasper and Levinski that neither told Joyce that she had to be at the meeting.

23.    Levinski did not tell Joyce she had to support the district before the community

---

[55] Rock 74:24-75:2.
[56] Rock 75:10-17.
[57] Rock 75:18-76:1.
[58] Rock 76:2-6; Rock affidavit paragraph 3.
[59] Rock 84:10-11.

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

meeting, neither Levinski nor Kasper discussed any expectations for the community meeting.[61] Levinski is not even sure if he said that.[62]

24.     Joyce did not open the meeting as principal or otherwise as shown by the testimony cited disputing "facts" nos. 21 and 22 above.

26.     Joyce Rock disputes that part of "fact" no. 26 alleging that what she said or how she said it "set a poor tone" for the meeting or that it caused a threatening gesture by a student. First, Joyce did not speak disrespectfully or improperly in any way.[63] Kasper testified that she probably spoke in her usual manner, matter of factly, [64] as confirmed by Cathy Cullicott.[65] Furthermore, the cited testimony, again, is not as represented, as Joyce testified that the one student who was corrected got emotional and tearful and too loud[66], but no one says he made a threatening gesture. Kasper testified that the student "screamed" but said nothing about threatening gestures.[67]

28.     Defendants' characterization that Joyce's speech was not intended to persuade is both immaterial to any matter in dispute and the cited testimony, again, does not say that. Joyce testified that she did not need to persuade anyone to oppose closing the school.

29.     The cited testimony is immaterial to a decision on whether Joyce's speech was in her official capacity or was not protected as disruptive to the District's work. Levinski did not terminate her for thanking him for holding the meeting or thanking the members of

---

60 Rock 87: 17-21.
61 Rock 68: 7-10.
62 Levinski 64:24-65:3.
63 Rock affidavit paragraph 7; Cullicott affidavit (Mrs. Rock did not speak in anyway disrespectfully to anyone and instead spoke in her usual calm and gracious manner in both her tone and in what I recall her saying).
64 Kasper II 52:21-53:10.
65 Cullicott Affidavit, footnote 44 above.
66 Rock 90:11-20.

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

the public who came to speak, he terminated her for publicly opposing closing Career Prep. Levinski testified that "the Wednesday night meeting (was) the primary reason why Joyce was fired", because she "publicly took the position that Career Prep should not be closed".[68]

36.     Joyce's speech in both content and tone was neither unprofessional nor contrary to the District's mission of offering the best education to the Career Prep students that the District had the resources to offer.[69] Levinski admits that the primary reason for terminating her was the content of her speech opposing closing Career Prep.[70]

37.     These allegations are also immaterial, as Levinski admitted the primary reason for terminating Joyce was the content of her speech cited above, and Kasper, her immediate supervisor, denies that the issue of her speaking to the Tse'Bit'Ai principal was related to her termination.[71]


**I. Standard of review**

   **A. General Summary Judgment Standard**

   A summary judgment motion doe not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences.[72] Summary judgments should not be granted in cases turning on the

---

[67] Kasper 16:16-22
[68] Levinski 9:20-12; 10:1-4.
[69] Rock affidavit paragraph 10; Cullicott affidavit.
[70] Levinski 9:20-12; 10:1-4
[71] Kasper 61:24-65:18.
[72] Windon Third Oil and Gas v. Federal Deposit Ins., 805 F.2d 342, 346 (10th Cir. 1986), cert. denied, 480 U.S. 947 (1987).

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

employer's intent.[73] The summary judgment standard is applied with added rigor in cases where intent and credibility are crucial issues."[74]  Under Rule 56, defendants here must show the absence of any material fact necessary to resolve matters in dispute with all evidence viewed in a manner most favorable to the non-movant.[75]

The United States Supreme Court has just reminded courts and litigants that the summary judgment record must be viewed in the light most favorable to Joyce Rock here, in *Tolan v. Cotton.*[76] The Fifth Circuit had failed to view the evidence at summary judgment in the light most favorable to that plaintiff with respect to the central facts of the case, and in so doing improperly "weigh(ed) the evidence" and resolved disputed issues in favor of the moving party and failed properly to acknowledge key evidence offered by the party opposing that motion. In the vernacular, the whole record must be viewed in the light most favorable to plaintiff and not "cherry-pick" facts in support of a conclusion that must be left to the jury.

### B. Modified standard for qualified immunity claim

Controlling this case, in addition to the general standard of decision set forth above, when the inquiry into the qualified immunity asserted here by Levinski turns on a subjective element, as it does when examining motive in a First Amendment retaliation case, the qualified immunity analysis is 'modified slightly.'"[77] The defendant must do more than merely raise the qualified immunity defense; he must make a prima facie showing of the objective reasonableness of the challenged conduct.[78] Only if the

---

[73] Cone v. Longmont United Hosp. Ass'n., 14, F2.d 526, 530 (10th Cir. 1994).
[74] Id.
[75] Abercrombie v. City of Catoosa, 896 F.2d 1228, 1230 (10th Cir. 1990).
[76] 572 U.S. ___ (2014), May 5, 2014, 2014 WL 1757856.
[77] McBeth v. Himes, 598 F.3d 708 (10th Cir. 2010); see also Mimics, Inc. v. Village of Angel Fire, 394 F.3d 836, 848 (10th Cir. 2005).
[78] Id.

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

defendant makes this prima facie showing, must the plaintiff then produce specific evidence of the defendant's culpable state of mind to survive summary judgment.[79]

### C. Determining whether Joyce's speech was commissioned by or created by her employer is a mixed question of fact and law

Defendants here assert that Joyce Rock's speech that is admitted as the primary basis for her termination is not constitutionally protected speech. That speech is evaluated in this Circuit on a five-part analysis set forth in defendants' motion. Defendants only challenge Joyce's First Amendment retaliation claim on the first and third inquiries of that analysis, that her speech arose from her official duties as the principal of Career Prep High School, and that it disrupted the business of the District in providing an education to the students of Career Prep.

In *Garcetti*, the Supreme Court did not set forth specific criteria for determining when speech is made pursuant to an employee's officials duties, instead instructing that the inquiry "is a practical one(,)" because "the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes."[80] It also noted that speech by a public employee retains some possibility of First Amendment protection when it "is the kind of activity engaged in by citizens who do not work for the government."[81]

In *Garcetti,* there was no dispute that the speech at issue was one of the core requirements of the plaintiff's work duties. The facts were clear cut and unambiguous. It was a controlling factor in the case that plaintiff's expressions were made pursuant to

---

[79] Id at 724-25.
[80] *Garcetti,* 547 U.S. at 424-25.

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

his duties as a calendar deputy.[82] Examining the question of whether this inquiry was a matter of law for the Court to decide or at least a mixed question of law and fact requiring some determination by a jury to determine, the Ninth, Third, Seventh, and Eighth Circuits have held that determining whether an employee's speech was made as a citizen or as part of her official duties as a matter of law would be inconsistent with Garcetti's fact intensive inquiry of the "practical" matter, and is a mixed question of law and fact.[83]  Posey held that because determining the scope of a plaintiff's job responsibilities is concrete and practical rather than abstract and formal, a factual determination of a plaintiff's job responsibilities will not encroach upon the court's prerogative to interpret and apply the relevant legal rules.[84]  The Court reasoned that an issue does not lose its factual character merely because its resolution is dispositive of the ultimate constitutional question, citing Miller v. Fenton.[85]The inquiry is not a situation in which the fact-finding process has any potential to "cross( ) the line ... into the realm of a legal rule upon which the reviewing court must exercise its own independent judgment."[86] The Ninth Circuit further analyzed this question noting that while a jury's determination as to a plaintiff's job responsibilities may at times appear in itself dispositive of the protected status inquiry, the "rule of independent review" will always require the court independently to evaluate the ultimate constitutional significance of the facts as found.[87]

Ultimately the Ninth and other Circuits hold that inquiry into the protected status

---

[81] Id at 423.
[82] Posey v. Lake Pend Oreille Sch. Dist. No. 84, 546 F.3d 1121, 1127 (9th Cir. 2008).
[83] Posey at 1127, (examining the Circuit split), 1129 (holding).
[84] Posey at 1129.
[85] 474 U.S. 104, 113 (1985).
[86] Bose Corp.v. Consumer Union of United States, Inc., 466 U.S. 485, 501 n. 17 (1984)

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

of speech presents a mixed question of fact and law, and specifically that the question

of the scope and content of a plaintiff's job responsibilities is a question of fact. Trial

courts should therefore determine first whether the expressions in question were made

by the speaker ... upon matters of public concern and second whether the state

lacked adequate justification for treating the employee differently from any other

member of the general public. If the answer to both questions is yes, then the possibility

of a First Amendment claim arises. After having answered each affirmatively, only then

should the court consider whether the plaintiff spoke as a private citizen or a public

employee. But when there are genuine and material disputes as to the scope and

content of the plaintiff's job responsibilities, the court must reserve judgment on this third

prong of the protected status inquiry until after the fact-finding process.[88]

   The Tenth Circuit has held that the question in one of law for the Court, in

*Brammer-Hoelter v. Twin Peaks Charter Academy.*[89] That case did not present the Tenth

Circuit with the question however and the Court stated without analysis that the

question was one for the court, citing *Cragg v. City of Osawatomie, Kan.*[90] *Cragg* in turn

is a pre-*Garcetti* case in which the only question was whether the employer's interest in

controlling speech outweighed the employee's right to speak.

   The better-reasoned approach is that of the Ninth, Third, Seventh and Eight

Circuits. In the cases broadly defining official duties to include speech that is "related"

to the employee's employment speech is ultimately chilled. Broadly interpreting the

scope of speech made pursuant to official duties forces employees to steer far wider

---

[87] Id at 500-01.
[88] Posey at 1130.
[89] 492 F.3d 1192, 1203 (10th Cir. 2007).
[90] 143 F.3d 1343 (10th Cir. 1998)

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

from the realm of lawful speech. Speech relatedness to an official duty is not the rule articulated in *Garcetti*. The Court specifically warned against employers restricting employees' rights by creating excessively broad job descriptions.  Where *Garcetti* explicitly prohibited employers from creating excessively broad job descriptions, courts should not expand the scope of official duties to encompass all related employment activities solely to connect the speech to the duty? To do so strikes at the very core of the First Amendment, a liberty still rigorously protected by *Garcetti.*

## II. First Amendment Retaliation

Under the First Amendment, applicable to the states by way of the Fourteenth Amendment, public employees retain the right to comment upon matters of public concern. [91] As the Supreme Court has explained, "(speech) concerning public affairs is more than self-expression; it is the essence of self-government."[92]  Consequently, when an employee speaks as a citizen on matters of public concern, that speech "occupies the 'highest rung of the hierarchy of First Amendment values' " and so merits "special protection."[93]

Defendants' motion argues as if the employee speaking about a matter that is in any way connected to her employment can never engage in protected speech. Because plaintiff was the principal at Career Prep, according to defendants' view, any speech connected to Career Prep must not be protected. Because this is contrary to *Garcetti's* protections of speech made by an employee as a citizen, even about matters related to her employment, defendants' motion must fail. Not all speech about

---

[91] Connick v. Myers, 461 U.S. 140.
[92] Connick, 461 U.S. at 145.

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

the subject matter of an employee's work is necessarily made pursuant to the employee's official duties.[94] "The First Amendment protects some expressions related to the speaker's job.[95]

The question under Garcetti is not whether the speech was made during the employee's work hours, or whether it concerned the subject matter of his employment.[96] Even where an employee's speech was made *at* work and *about* work does not necessarily remove that employee's speech from the ambit of constitutional protection.[97]. Rather, it is whether the speech was made pursuant to the employee's job duties or, in other words, whether the speech was "commissioned" by the employer.[98] Put another way, the ultimate issue is whether the employee's speech "stemmed from and (was of) the type ... that (the employee) was paid to do."[99]

The distinction between Joyce's protected speech made at the public meeting and the black hole making all public employee speech unprotected under defendants' misreading of the cases is shown in *Brammer-Hoelter v.Twin Peaks Charter Academy.*[100]

In *Brammer-Hoelter,* several teachers had multiple concerns and grievances about the operation, management and mission of their school. They met many times off-campus to discuss a long list of issues. Some meetings included parents and other members of the public. The issues of concern included both matters within their

---

[93] Id.
[94] Brammer-Hoelter v. Twin Peaks Charter Academy, 492 F.3d at 1203-04, citing Garcetti.

[96] Garcetti at 421.
[97] *See* Brammer-Hoelter, 492 F.3d at 1204
[98] Garcetti, 547 U.S. at 421-22.
[99] Rohrbough v. Univ. of Colo. Hosp. Auth., 596. F.3d 741, 746 (10th cir 2010).

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

employment as teachers and a handful of matters that were not related to the employment duties.

The defendants claimed that all of the teacher's concerns were brought forward pursuant to their contractual duty to "support the philosophy and curriculum" of the school and were thus unprotected speech made pursuant to their job duties. The Court rejected defendants' attempt to portray the teachers employment duties in a manner so broadly that it would eviscerate Garcetti's admonition that employers are not permitted to restrict employees' speech by creating overly broad job descriptions.

Despite finding that many of the teachers' concerns were connected to their job duties, the Tenth Circuit reversed the trial court grant of summary judgment on the teachers' speech concerning teacher salaries and bonuses, staffing levels, criticisms of the School Board, criticisms of the principal and treatment of parents by the Board.[101]

The Court held that these were matters for which the teachers had no supervisory responsibility or duty to report to anyone about. The discussions also were protected in part because they were made with members of the public and not during work hours.

In this case, Joyce is not responsible for administrative decisions about budget or closing a school. Defendants' here try to enlarge her responsibilities in the same manner rejected by Brammer-Hoelter by ascribing generic reporting duties to her on budget and operation matters of her school. Her speech made to the public assembly, at a meeting held for the purpose of public comment, was critical of the choice being proposed that would affect District spending, and the treatment of students and their parents that would result from Career Prep closing. The speech was not "commissioned"

---

[100] 492 F.3d 1192 (10th Cir. 2007).

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

by the employer,[102] as is evident by Levinski's objection to its content, the reason Joyce was terminated. The same speech protected in *Brammer-Hoelter* is protected here.

That Joyce's speech was made as citizen is also shown by the fact that she had already spoken, as principal, to her staff, her students and then again with her staff to defendant Levinski. She was not required to be at the community meeting, but chose to be there as one more concerned citizen of Shiprock opposed to closing Career Prep. The audience, as called for by the Superintendant, was the public; parents, students, ex-students and anyone not an employee that he had already met with. It was a forum at which any citizen could, and did, speak.[103]

This was a public meeting, called by Levinski for the express purpose of public comment. Joyce made her comments to the public gathered, there. She did not state any information that was known to her only because she was a principal. Joyce joined in echoing the testimonies of parents, students and ex-students of their successes at Career Prep contrasted with their difficulties at other District schools, as the basis for their collective plea that the school not be closed.  Any citizen there in accord with the purpose for which the meeting was called by Levinski could and did present the same points as did Joyce, making all of their speech protected.[104] In her speech, Joyce was engaging in the same activity as the other citizens there who were not public employees.[105]  *Garcetti* specifically  listed as examples of prototypical protected speech by public employees making a public statement. Joyce was making this

---

[101] Brammer-Hoelter at 1204-05.
[102] Garcetti, 547 U.S. at 421-22
[103] See, Tamayo v. Blagojevich, 526 F.3d 1074 (7th Cir. 2008).
[104] City of Madison, Joint Sch. Dist. No. 8 v. Wisconsin Employment Relations Comm'n, 429 U.S. 167, 175 (1976)(speech by plaintiff protected at a public meeting where any citizen could have presented the views on an important decision of his government).
[105] Garcetti at 423.

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

speech to the public, media present included, the outside authority from which Levinski was seeking input on the proposed closing of Career Prep.

Under defendant's analysis Ms. Rock never sets aside her principal hat and dons her citizen hat, if she speaks about an educational issue, and Garcetti makes plain that is not the law. Ms. Rock's speech is the public advocacy on a topic that is at the core of the First Amendment's protection, questioning the government's actions as they affect not only her but the public.

**III. No disruption of District business**

Defendants' allegations about the alleged disruption of district business and subjective disapproval of the content of Joyce's speech is exactly the type of prohibited speculation that does not outweigh Joyce's First Amendment rights in this context. It is the government's burden to justify the challenged termination here where it is admitted that Joyce was terminated due to her speech at the public meeting, on legitimate grounds. Defendant here cannot rely on purely speculative allegations that certain statements caused or will cause disruption to justify the regulation of employee speech.[106]

The Pickering balancing test requires a "fact-sensitive" weighing of the government's interests [107] as to the *particular* speech at issue.[108]  Here, those facts are in dispute, precluding summary judgment on this element of the analysis.

The law as stated in Defendants' motion shows that Joyce's speech must be analyzed taking into consideration the manner, time, place and context of the

---

[106] Anderson v. McCotter, 100 F.3d 723, 728-29 (10th Cir. 1996)
[107] Id.
[108] Thomas v. City of Blanchard, 548 F.3d 1317, 1327 (10th Cir. 2008).

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

speech.[109]   In balancing the employee's right to speak against the employer's right to

limit such speech, greater weight is given to speech that has been deemed to be a

matter of public concern.[110] The *Pickering* analysis requires the court to determine if

there is undisputed evidence that the employer has an efficiency interest which would

justify it *in restricting the particular speech at issue.*" [111] (emphasis added).


Defendants' motion contends that Joyce's speech should be deemed disruptive

to the point that her right to speak is outweighed by the employer's interests on the

basis that her tone and content were "unprofessional"; that her speech interests were

"slight" and that her speech, given her position as a principal was predictive of

disruption going forward. Each of these allegations are disputed in the competent

summary judgment record or are totally prohibited speculation.


First, Joyce's speech was the type of core speech protected by the First

Amendment, questioning government conduct in a public forum.[112]  This speech is on a

matter of public concern, as defendants' do not challenge that element of the

analysis, and on these facts it was clearly a matter of great concern to the citizens of

Shiprock. This speech is therefore entitled to greater weight in the balancing analysis to

be made here.[113]

---

[109] Deschenie v. Bd. of Educ. of Cent. Consol. Sch. Dist. No. 22, 473 F.3d 1271, 1279 (10th Cir. 2007).
[110] Id.
[111] Thomas v. City of Blanchard, 548 F.3d 1317, 1327 (10th Cir. 2008)
[112] City of Madison, Joint Sch. Dist. No. 8 v. Wisconsin Employment Relations Comm'n, 429 U.S. 167, 175 (1976)
[113] Deschenie v. Bd. of Educ. of Cent. Consol. Sch. Dist. No. 22, 473 F.3d 1271, 1279 (10th Cir. 2007).

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

The tone and manner of Joyce's speech is also in dispute. Joyce, Cathy Cullicott and Phil Kasper describe her tone as respectful, calm, not made in a manner to incite heightened emotions among the public gathered there; [114] calm and gracious; [115] and matter of fact.[116] No person at the meeting ever told Joyce that they thought her speech was inappropriate in any way.[117] All the students but one were respectful[118] and he was calmed down and apologized.[119] Even Kasper, her immediate supervisor didn't complain about her to Levinski on the night of the meeting. Levinski's conclusory label of "unprofessional" originates with his objection to the <u>content</u> of Joyce's speech alone. The listeners like Cathy Cullicott disagree.

Joyce did not orchestrate or otherwise incite any student reaction; she did not spend "three days" drumming up student opposition, it was only one day in the first place from when she told the students to the Wednesday night meeting. Defendants omit reference to the testimony from Joyce that what she told the students in any event was that they could try to persuade people to keep the school open but that it had to be done in a positive attitude and that it could not be negative in any way.[120] Each person who spoke only addressed the positive life changes that Career Prep had meant to them or those they had observed graduate who wouldn't have in another setting.[121]

---

[114] Rock Affidavit paragraph 7
[115] Exhibit 4, Cullicott affidavit.
[116] Additional fact P; Kasper II 52:21-53:10.
[117] Rock affidavit paragraph 11.
[118] Rock deposition 90:7-10.
[119] Rock 90:12-13.
[120] Defendants' Exhibit A, Rock deposition p. 69:12-23.
[121] Additional fact R.

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

Despite this exaggeration by Levinski, he has not set forth any facts that would show that Joyce did anything improper on this subject resulting in this factor being unsupported in the balancing of the competing interests.

Kasper also disagrees that there was any disruption to the business of the district occasioned by Joyce's speech.[122] He was her supervisor and Joyce did not have any day-to-day interaction with Levinski such that any disruption would be caused even if there was some factual basis for making that claim.[123]

The speculation offered in support of defendants' allegation of disruption going forward is also contradicted by the fact that Phil Kasper did not believe Joyce should be terminated and put her on a growth plan. She had complied with the growth plan, following its directives up through the time she was terminated. The issue that was in dispute was now moot, there would be no more public or any other speech opposing district policy because Career Prep was kept open. A reasonable jury could conclude that none of Levinski's allegations that Joyce would be a bad manager or disruptive are credible, precluding summary judgment on this issue.

## IV. Qualified Immunity

Joyce's speech was constitutionally protected as shown above making it a matter for a jury whether her speech was the cause of her termination. The remaining question under the qualified immunity analysis is whether Levinski violated "clearly established law" by terminating her. The Tenth Circuit has long made clear that when a public employee speaks as a citizen on matters of public concern despite the absence

---

[122] Additional fact Y.

[123] Additional facts Y, W and X.

26

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

of any job-related reason to do so, the employer may not take retaliatory action.[124]
Levinski is not entitled to qualified immunity.

For the reasons, fact and authorities stated, defendants' motion should be
denied.

Respectfully submitted:

 /s/ Timothy L. White
Valdez and White Law Firm
Timothy L. White
P.O. Box 25646
Albuquerque, N.M. 87125
Phone: (505) 345-0289

---

[124] Thomas v. City of Blanchard, 548 F.3d 1317, 1328 (10th Cir. 2008).

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com